**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-00757-MSK

ERIC HUMES,

      Petitioner,

v.

WARDEN MIKE ARELLANO, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

---

      This matter comes before the Court on the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition") (Doc. # 2) filed by *pro se* Petitioner Eric Humes. Respondents filed an Answer (Doc. # 24), and Petitioner filed a Traverse (Doc. # 32). After reviewing the pertinent portions of the record in this case including the Petition, the Answer, the Traverse, and the state court record, the Court **FINDS** and **CONCLUDES** that the Petition should be denied.

## I. Background

      On June 3, 2003, sometime after midnight, Petitioner, a crack cocaine dealer, awoke and discovered that someone had taken some of his crack cocaine. Petitioner immediately confronted two men, Orlando Mayes and Sam Snyder, who were with him in the apartment from which he was selling the drugs. After apparently being satisfied that neither man had taken the missing crack cocaine, Petitioner left to find three women, Shelly Mack, Debra Bellamy, and Catherine Dixon, who had been at the

apartment earlier in the night. Petitioner went first to Ms. Mack's home, where he threatened and beat her. Petitioner then went to another apartment building where he found Ms. Bellamy and Ms. Dixon outside. After arguing with the women, Petitioner shot both of them, killing Ms. Dixon and wounding Ms. Bellamy.

Petitioner originally was charged by information in August 2003. After he entered a plea and counsel was appointed to represent him, the government dismissed the charges in September 2003 and launched a grand jury investigation. The grand jury returned an indictment against Petitioner in January 2004. Following a jury trial in Denver District Court case number 04CR88 that began on July 26, 2004, Petitioner was convicted on one count each of first degree murder, attempted first degree murder, second degree assault, menacing, and third degree assault. He also was adjudicated to be an habitual criminal based on his prior convictions. The convictions for second degree assault and attempted first degree murder merged and Petitioner was sentenced to the following consecutive prison terms: life for first degree murder, seventy-two years for attempted first degree murder, nine years for menacing, and eighteen months for third degree assault.

On direct appeal, the Colorado Court of Appeals affirmed the judgment of conviction and remanded for correction of the mittimus with respect to mandatory parole. *See People v. Humes*, No. 05CA1053 (Colo. App. Jan. 31, 2008) (unpublished decision) (Doc. # 24-5). On May 27, 2008, the Colorado Supreme Court denied Petitioner's petition for writ of certiorari on direct appeal.

On May 18, 2006, while his direct appeal was pending, Petitioner filed a postconviction motion to correct an illegal sentence, which the trial court denied on July

5, 2006. On July 21, 2008, Petitioner filed a postconviction motion to reconsider his sentence that was denied by the trial court the next day.

The Court received the instant action for filing on March 25, 2009. Petitioner asserts the following nine claims for relief:

> 1. The prosecution abused the grand jury procedure to gain a tactical advantage in violation of his right to due process.
>
> 2. The trial court's refusal to instruct the jury regarding the affirmative defense of self-defense violated his rights to due process and a trial by jury.
>
> 3. The trial court's refusal to instruct the jury regarding his ineligibility for parole if convicted of first degree murder violated his right to due process.
>
> 4. He was denied a fair and impartial jury as a result of the trial court's denial of a challenge for cause.
>
> 5. His right to confrontation was violated by the erroneous admission of a police report as a prior consistent statement.
>
> 6. His right to confrontation was violated when the trial court erroneously limited his cross-examination of a witness.
>
> 7. The trial court's refusal to grant a mistrial after a witness informed the jury of prior grand jury testimony violated his right to due process.
>
> 8. The prosecution committed misconduct during closing arguments.
>
> 9. His enhanced sentence as an habitual criminal violates the Sixth Amendment right to trial by jury and due process because the facts necessary to support an enhanced sentence were found by the trial court rather than the jury.

During the initial review of this action, Senior Judge Zita Leeson Weinshienk dismissed claim seven as procedurally barred. (*See* Doc. # 10.) With regard to the remaining claims, Respondents concede that they are timely asserted and have been

3

properly exhausted.

## II. Legal Standards

The Court must construe the Petition and other papers filed by Petitioner liberally because he is not represented by an attorney. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be an advocate for a *pro se* litigant. *See Hall*, 935 F.2d at 1110.

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Claims of legal error and mixed questions of law and fact are reviewed pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question pursuant to § 2254(d)(1) is whether Petitioner seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Furthermore,

clearly established law consists of Supreme Court holdings

in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1). *See id.* at 1018. If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404-05.

A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).

A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an

5

objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. "[O]nly the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.*

Claims of factual error are reviewed pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002). Section 2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to that court. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

Finally, the Court "owe[s] deference to the state court's *result*, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [the Court's] independent review of the record and pertinent federal law persuades [the Court] that its result contravenes or unreasonably applies clearly established federal

6

law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "[T]his 'independent review' should be distinguished from a full de novo review of the petitioner's claims." *Id.*

If a claim has not been adjudicated on the merits in state court, and also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

### III. Analysis

### A. Claim One

Petitioner first claims that the prosecution abused the grand jury procedure to gain a tactical advantage in violation of his constitutional right to due process. As noted above, Petitioner originally was charged by information in August 2003 and, after he had entered a plea of not guilty and counsel had been appointed to represent him, the prosecution dismissed the charges in September 2003 and opted to pursue a grand jury investigation. At the same time the prosecution dismissed the original charges in September 2003, probation revocation proceedings were initiated against Petitioner in two prior criminal cases from 1999 and 2001. In October 2003, Petitioner's probation was revoked and he was sentenced to twelve years in prison in the prior cases, "ensuring that he would be incarcerated while the prosecution work[ed] on the case." (Doc. # 2 at p.6.) Because the new charges had been dismissed, Petitioner's representation by counsel ceased after his October 2003 resentencing in the 1999 and 2001 cases.

Petitioner was indicted by a grand jury in January 2004 and counsel was

reappointed to represent him at his advisement in February 2004.

> On March 8, 2004, the defense filed a written motion
> to dismiss the indictment [a]sserting that the prosecution's
> conduct violated principles of due process, joinder, double
> jeopardy, and speedy trial.  At the same time, the defense
> filed a motion requesting a hearing on the validity and
> propriety of the indictment.  The motion to dismiss noted the
> prosecution had acted in bad faith by dismissing the original
> charges and proceeding by grand jury in [an] attempt to
> avoid rules of discovery, avoid speedy trial, and deny
> petitioner[]counsel.  The motion specifically noted that the
> prosecution had used the grand jury process tactically, as a
> means of denying petitioner access to counsel while
> proceedings were under way, denying him the ability to
> pursue a defense by incarcerating petitioner on the probation
> violations, securing testimony without notifying the defense
> as would otherwise be required to take depositions,
> harassing and compelling testimony from grants of immunity,
> paying witnesse[s'] expenses, avoiding the requirement of
> providing discovery of witness statements to the defense,
> and ensuring that the witne[s]ses would not speak to the
> defense because the grand jury secrecy prohibited it.

(Doc. # 2 at p.7 (citations to record omitted).)  On direct appeal, the Colorado Court of

Appeals noted that, in responding to the motion to dismiss, the prosecutor stated "she

had dismissed the original charges because she had concluded that she could not

prove them beyond a reasonable doubt, and that she believed she could obtain

additional information through use of a grand jury investigation."  (Doc. # 24-5 at p.11.)

As noted above, Petitioner specifically asserts his first claim as a due process

claim.  Although Petitioner also refers to and addresses *Barker v. Wingo*, 407 U.S. 514

(1972), and his constitutional right to a speedy trial within the discussion of his first

claim, Petitioner's contention that his rights were violated in the course of obtaining the

grand jury indictment against him is not cognizable under the Speedy Trial Clause of the

Sixth Amendment, which is "wholly irrelevant" to the issue of preindictment delay.

8

*United States v. Lovasco*, 431 U.S. 783, 788 (1977). Therefore, the Court construes

Petitioner's first claim liberally as a due process claim challenging preindictment delay.

To the extent Petitioner may be asserting his first claim as a speedy trial claim, the

claim lacks merit and must be denied.

Although a criminal defendant's primary protection against the prosecution of

overly stale claims is the statute of limitations, "the Fifth Amendment's due process

clause does have a 'limited role to play in protecting against oppressive delay.'" *Perez*

*v. Sullivan*, 793 F.2d 249, 259 (10th Cir. 1986) (quoting *Lovasco*, 431 U.S. at 789).

However, "[p]reindictment delay is not a violation of the Due Process Clause unless the

defendant shows both that the delay caused actual prejudice and that the government

delayed purposefully in order to gain a tactical advantage." *United States v. Johnson*,

120 F.3d 1107, 1110 (10th Cir. 1997).

In addition to citing a number of state court cases, the Colorado Court of Appeals

cited *Lovasco* and applied this clearly established federal law in its analysis of

Petitioner's preindictment delay claim. The Colorado Court of Appeals ultimately

concluded that Petitioner failed to demonstrate either prejudice from the allegedly

excessive delay or any misconduct by the prosecution. With respect to the prejudice

prong, the Colorado Court of Appeals reasoned that

> Defendant did not show that he was hindered in his ability to
> prepare a defense or deprived in any way of discovery to
> which he was entitled. The eleven-month delay between his
> initial not guilty plea and the commencement of his trial was
> not so great as to constitute a due process violation, and the
> fact that he was incarcerated on other charges during that
> period does not establish that he was prejudiced by the
> grand jury proceedings.

(Doc. # 24-5 at pp.11-12.)  With respect to the misconduct prong, the Colorado Court of Appeals determined that "[t]he prosecutor's explanation of her reasons for dismissing the original complaint was sufficient for the trial court to conclude that the dismissal and institution of grand jury proceedings were for a valid purpose.  The court was not required to accept defendant's speculation that the prosecutor's motives were other than valid."  (Doc. # 24-5 at p.12. (citation omitted).)

The Colorado Court of Appeals' decision rejecting Petitioner's preindictment delay claim is neither contrary to nor an unreasonable application of clearly established federal law.  Although the Colorado Court of Appeals considered the entire eleven-month period between Petitioner's original plea in August 2003 and the commencement of his trial in July 2004, the Court notes that Petitioner actually was indicted in January 2004.  Petitioner does not identify the existence of any prejudice resulting from the dismissal of the original charges in September 2003 and the grand jury indictment in January 2004.  In particular, as noted by the Colorado Court of Appeals, Petitioner fails to demonstrate that his ability to prepare a defense was hindered or that he was deprived of any discovery to which he was entitled.  The Court also agrees that Petitioner's incarceration stemming from the revocation of his probation in two prior criminal cases does not establish actual prejudice with respect to the new charges.

Furthermore, Petitioner fails to demonstrate that the prosecution delayed his indictment in order to gain a tactical advantage.  Given the prosecutor's admission when the original charges were dismissed that she could not prove the charges beyond a reasonable doubt, it is clear that the use of a grand jury to obtain additional evidence clearly benefitted the prosecution's case against Petitioner.  However, there is no

indication that the prosecution purposefully delayed obtaining an indictment in order to gain a tactical advantage. Therefore, the Court concludes that Petitioner's first claim for relief lacks merit and must be denied.

## B. Claim Two

Petitioner's second claim is that the trial court's refusal to instruct the jury regarding the affirmative defense of self-defense violated his rights to due process and a trial by jury. The trial court rejected the self-defense instruction tendered by Petitioner because "there was 'no evidence at all to support a self-defense instruction here.'" (Doc. # 24-5 at p.5.) Petitioner specifically contends that an instruction on self-defense was appropriate based on: (1) testimony that a knife was found under the murder victim's head; (2) testimony that he and the victim were arguing before the shooting; and (3) evidence of "stippling" on the victim's hand that, according to testimony from the coroner, indicated the victim's hand was exposed to gunpowder and could be consistent with her holding a knife toward the shooter.

On direct appeal, the Colorado Court of Appeals stated that "[t]he trial court has a duty to instruct the jury correctly on all matters of law for which there is sufficient evidence to support giving instructions." (Doc. # 24-5 at p.4.) The Colorado Court of Appeals then recited the applicable statute governing self-defense in Colorado.

> Section 18-1-704(1), C.R.S. 2007, states that, with certain exceptions,
>
>> a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he

> reasonably believes to be necessary for that
> purpose.

(Doc. # 24-5 at p.5.) Ultimately, the Colorado Court of Appeals agreed with the trial court that the evidence at Petitioner's trial did not warrant a jury instruction on self-defense.

> A police officer testified that, when the victim's body was removed, a small paring knife was found lying on the ground under her head. However, even assuming the knife belonged to the victim, there was no evidence at all that she was holding the knife, or that defendant even saw it – let alone, that he reasonably believed it was necessary to use force to defend himself. Indeed, the eyewitnesses uniformly testified that the victim made no move toward defendant and did not pull out a weapon. In these circumstances, the mere presence of a paring knife under the victim's body did not constitute evidence tending to establish self-defense. *See Laurson*, 15 P.3d at 795 (rejecting defendant's argument that the evidence supported a self-defense instruction, where there was "no evidence presented which indicated that defendant would have had a reasonable belief that he needed to use force to protect himself against the use of force").

> Nor does the additional evidence cited by defendant, even considered together with the knife, constitute evidence that he was acting in self-defense. While some eyewitnesses testified that defendant and the victim had a brief verbal argument before the shooting, and one witness saw the victim moving her hands as she argued, the same witnesses testified that neither the victim nor the other woman made any aggressive move toward defendant. *See Laurson*, 15 P.3d at 795; *People v. Whatley*, 10 P.3d 668, 670 (Colo. App. 2000) (neither defendant's statements that he had "wrestled around" with and "pushed toward" victim, nor any other evidence in the record, amounted to evidence that he defended himself because he reasonably believed that unlawful force was about to be or was being used against him; therefore, trial court did not err in refusing to instruct on self-defense).

> The reference to "stippling" on the victim's hand

likewise did not constitute evidence of self-defense.  After the coroner testified on direct examination that stippling on the back of the victim's hand indicated that her hand was exposed to gunpowder and could be consistent with her shielding herself from a gun, the following colloquy took place on cross-examination:

| | |
|---|---|
| [DEFENSE:] | Now, you talked a bit about stippling on [the victim's] hand. |
| [WITNESS:] | Yes. |
| [DEFENSE:] | And [the prosecutor] asked you if that could be consistent with [the victim's] shielding herself from the bullet, correct? |
| [WITNESS:] | That's correct. |
| [DEFENSE:] | And you said that's a possibility. |
| [WITNESS:] | Yes. |
| [DEFENSE:] | There are a number of possibilities, correct? |
| [WITNESS:] | Yes. |
| [DEFENSE:] | For instance, if [the victim] was holding a knife out towards the shooter. |
| [WITNESS:] | Correct, as long as the back of her hand was exposed to the shooter. |

Defense counsel's hypothetical about "holding a knife out towards the shooter" was not based on any evidence, and the fact that the coroner responded in the affirmative to the hypothetical does not make his response into evidence of self-defense.

(Doc. # 24-5 at pp.5-8.)

The Court must "employ a highly deferential standard of review in evaluating the state trial court's refusal to deliver Petitioner's requested self-defense instruction."  *Tyler*

*v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999). Generally, an error in jury instructions may not be reviewed in federal habeas corpus proceedings unless the error renders the entire proceedings fundamentally unfair. *See Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973) for the proposition that the question in a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process"). "Because a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal brackets and quotation marks omitted). The Court's "[i]nquiry into fundamental unfairness requires examination of the entire proceedings." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (per curiam).

Furthermore, the burden is especially great when attacking a conviction based on a refusal to give a requested jury instruction because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. In order "[t]o determine whether the state trial court's refusal to deliver a self-defense instruction violated Petitioner's federal constitutional right to due process, [the Court] must turn to [Colorado] self-defense law to assess whether, under state law, Petitioner was entitled to such an instruction." *Tyler*, 163 F.3d at 1227.

Based on the Court's review of the state court record, the Court cannot conclude that the trial court's refusal to deliver Petitioner's tendered self-defense instruction was erroneous under Colorado state law. As shown above, the Colorado Court of Appeals

determined as a factual matter that there was no evidence the victim had been holding the knife discovered under her head, there was no evidence Petitioner had seen a knife or reasonably believed it was necessary to use force to defend himself, and the eyewitnesses uniformly testified that the victim made no move toward Petitioner and did not pull out a weapon. The Court must presume these factual determinations are correct because Petitioner fails to present clear and convincing evidence to contradict them. *See* 28 U.S.C. § 2254(e)(1). In light of these facts, it is clear that Petitioner was not entitled to a self-defense instruction under Colorado law because there was no evidence to support a reasonable belief that it was necessary to defend himself against the use or imminent use of unlawful physical force. The additional evidence of stippling on the victim's hand and testimony that a verbal argument may have occurred does not alter the Court's conclusion. Therefore, there is no basis for concluding that the failure to instruct the jury on self-defense as requested by Petitioner rendered the entire proceedings fundamentally unfair.

Petitioner's argument that his right to trial by jury under the Sixth Amendment was violated is premised on his contention that an erroneous refusal to instruct the jury on self-defense lowered the prosecution's burden of proof. This claim lacks merit because, as discussed above, the trial court's refusal to instruct the jury on the affirmative defense of self-defense was not erroneous.

## C. Claim Three

Petitioner contends in his third claim that the trial court's refusal to instruct the jury regarding his ineligibility for parole if convicted of first degree murder violated his right to due process. On the first day of trial, during jury selection, the trial court

informed the jury that Petitioner's case was not a death-penalty case.  However, the trial court refused to additionally inform the jury, despite defense counsel's request, that Petitioner would be subject to a mandatory sentence of life in prison without the possibility of parole if he was convicted of first degree murder.  According to Petitioner,

> due process required the court to instruct the jury as defense counsel requested because merely telling the jurors it was not a death case and leaving them to speculate that [Petitioner] could be subjected to a range of punishments upon conviction for 1st degree murder was misleading and likely caused confusion in the minds of the jurors.

(Doc. # 32 at p.7.)  The Colorado Court of Appeals rejected this claim based on a prior Colorado Supreme Court case that held "there is no constitutional violation where a jury is informed that the prosecution does not seek the death penalty without also being informed that a conviction would result in a mandatory life sentence with no possibility of parole for forty years."  (Doc. # 24-5 at pp.13-14 (citing *People v. Smith*, 848 P.2d 365, 369 (Colo. 1993)).)

Respondents argue that the Court must consider this claim using the same fundamental fairness analysis applied in the context of Petitioner's second claim.  The Court agrees.  To reiterate, an error in jury instructions may not be reviewed in federal habeas corpus proceedings unless the error renders the entire proceedings fundamentally unfair.  *See Nguyen*, 131 F.3d at 1357.  Furthermore, "[b]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self restraint."  *Duckett*, 306 F.3d at 999 (internal quotation marks omitted). The Court's "[i]nquiry into fundamental unfairness requires examination of the entire

proceedings." *Le*, 311 F.3d at 1013.

Based on a review of the entire state court record, the Court cannot conclude that the trial court's refusal to advise the jury that Petitioner would be subject to a mandatory sentence of life in prison without the possibility of parole if convicted of first degree murder rendered the entire proceedings fundamentally unfair. At the same point during jury selection when the trial court advised the prospective jurors it was not a death penalty case, the trial court further advised the jurors that "[t]he jury would have nothing to do with the determination of any sentence in this case should the Defendant be convicted. That will be my responsibility alone and you should not allow that to come into play at all in making decisions in this case." (State Court R., Vol. 11 at 95.) Because the jury had no role in sentencing, Petitioner's speculation that the jury may have been confused about the potential punishments does not demonstrate that the entire proceedings were fundamentally unfair.

Finally, although Petitioner cites to *Simmons v. South Carolina*, 512 U.S. 154 (1994), in support of his third claim, the Court finds that *Simmons* is not applicable to Petitioner's case. In *Simmons*, the Supreme Court held that a constitutional violation occurred because "[t]he Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *Id.* at 161 (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)). More specifically,

> In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's

refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and by the State's repeated suggestion that petitioner would pose a future danger to society if he were not executed. Three times petitioner asked to inform the jury that in fact he was ineligible for parole under state law; three times his request was denied. The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process.

*Id*. at 161-62. The Court finds that *Simmons* does not apply because Petitioner was not facing the death penalty and future dangerousness was not an issue.

## D. Claim Four

Petitioner asserts in his fourth claim that he was denied a fair and impartial jury as a result of the trial court's denial of a challenge for cause. More specifically, the trial court denied Petitioner's challenge for cause of Juror Folio, who stated on his juror questionnaire that he could not be fair if the case involved allegations of drug activity or male-on-female violence; who had been trying to become a law enforcement officer for several years; and whose brother worked for the Lakewood Police Department.

Although not mentioned by either party, and also not addressed by the Colorado Court of Appeals, Petitioner used a peremptory challenge to excuse Juror Folio after the trial court denied the challenge for cause. (*See* State Court R., Vol. 11 at 186.) On direct appeal, Petitioner argued that he was denied a fair trial because he was forced to use a peremptory challenge to excuse Juror Folio and he ultimately used all of his peremptory challenges. (*See* Doc. # 24-2 at pp.36-38.) Petitioner does not contend that any of the jurors who actually determined his guilt were biased or impartial.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant the right to an impartial jury. *See Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). If a "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," he should be dismissed for cause. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation marks omitted), *see also United States v. Scull*, 321 F.3d 1270, 1278 (10th Cir. 2003). However, in deciding whether the jury was impartial, the Court must focus on the jurors who ultimately deliberated and decided Petitioner's fate. *See Ross*, 487 U.S. at 86.

In the instant action, Petitioner's constitutional right to an impartial jury was not violated by the failure to dismiss a prospective juror for cause. Petitioner cured any constitutional error that may have occurred when the trial court refused to remove the prospective juror in question for cause by using a peremptory challenge to remove him from the jury panel. *See id*. at 88. The fact that Petitioner was required to use a peremptory challenge to achieve the goal of an impartial jury does not demonstrate that his constitutional rights were violated. *See id.* Therefore, Petitioner's fourth claim for relief lacks merit and also will be denied.

**E. Claim Five**

Petitioner next claims that his right to confrontation was violated by the erroneous admission of a police report as a prior consistent statement. The Colorado Court of Appeals accurately described the factual basis for this claim as follows:

Defendant next contends that the trial court

committed reversible error and violated his right to confrontation when it admitted, as nonhearsay admissible under CRE 801(d)(1), a police report that recounted an eyewitness's description of the shooter. We conclude that, even if the statement did not qualify for admission under CRE 801(d)(1) because it was a statement of a nontestifying police officer and not a prior consistent statement by the eyewitness himself, there was no reversible error.

During trial, the eyewitness testified that he had given a description of the shooter to the police dispatcher, but that he did not remember, as of the time of trial, exactly what the shooter was wearing. Without objection by defendant, the witness was then shown the police report containing his statement in order to refresh his memory. After having refreshed his memory, the witness stated that he had seen "a black male, average height maybe a little stocky, about [five-ten], wearing blue jeans and again I think a blue and white checkered shirt." The police report itself was subsequently received in evidence over defendant's hearsay objection. The report includes the officer's statement that the eyewitness had looked out the window and seen a "'stalky' black male about 5'10" wearing a blue and white checkered shirt and dark pants or shorts."

(Doc. # 24-5 at pp.17-18 (alteration in original).) The Colorado Court of Appeals concluded that any evidentiary error in admitting the police report was harmless because, "[a]lthough defendant argues that the report was 'much more definitive' than the eyewitness's refreshed testimony, we agree with the People that it was substantially cumulative of that testimony." (*Id.* at p.18.) For the same reason, the Colorado Court of Appeals "reject[ed] defendant's contention, raised for the first time on appeal, that admission of the report violated his confrontation rights." (*Id.*)

Respondents apparently concede that a constitutional error occurred because they argue that the Colorado Court of Appeals' harmless error analysis is neither contrary to, nor an unreasonable application of, the "substantial and injurious effect"

standard in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Respondents are correct that the Court in this habeas corpus proceeding pursuant to § 2254 "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht.*" *Fry v. Pliler*, 551 U.S. 112, 121 (2007). Pursuant to *Brecht*, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637. If the evidence is balanced so evenly that the Court is in grave doubt about whether the error meets this standard, the Court must hold that the error is not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995). The Court makes this harmless error determination based upon a review of the entire state court record. *See Herrera v. Lemaster*, 225 F.3d 1176, 1179 (10th Cir. 2000).

Petitioner argues that the error was not harmless "because [the eyewitness'] description of the man he saw was of crucial importance, as both the prosecution acknowledged in closing arguments and [the] jury made clear through it[]s follow-up question, and [the police report's] description was much more definitive than [the eyewitness'] testimony." (Doc. # 32 at p.9.) To reiterate, according to the Colorado Court of Appeals, the witness testified that "he had seen 'a black male, average height maybe a little stocky, about [five-ten], wearing blue jeans and again I think a blue and white checkered shirt.'" (Doc. # 24-5 at pp.17-18.) The witness' statement in the police report was that he had "seen a 'stalky' black male about 5'10" wearing a blue and white checkered shirt and dark pants or shorts." (*Id.* at p.18.)

The Court agrees with the Colorado Court of Appeals that the description in the police report was substantially cumulative of the description provided by the witness in

his testimony. Furthermore, the witness' description of the shooter was consistent with the testimony of various other eyewitnesses. As a result, the Court finds that the Colorado Court of Appeals' harmless error analysis is neither contrary to nor an unreasonable application of clearly established federal law. Based on the Court's review of the entire state court record, the Court cannot conclude that the erroneous admission of the police report had substantial and injurious effect on the jury's verdict. Therefore, this claim also will be denied.

## F. Claim Six

Petitioner's sixth claim is that his right to confrontation was violated when the trial court erroneously limited his cross-examination of Mr. Snyder. Mr. Snyder allegedly was with Petitioner on the night in question and testified that he saw Petitioner assault Ms. Mack and shoot both Ms. Bellamy and Ms. Dixon.

> During direct . . . examination of Mr. Snyder, the prosecution established that Mr. Snyder was currently on probation for two felonies picked up after the June 3, 2003 incident. The prosecution characterized the convictions for which Mr. Snyder was on probation as "[b]oth class 6 felonies of possession of a small amount of cocaine" and Mr. Snyder agreed.
>
> On cross-examination, the def[e]nse began to explore Mr. Snyder's interactions with the prosecution by asking what Mr. Snyder was originally charged with. The prosecution objected, defense counsel responded that the prosec[u]tion had opened the door to the facts surrounding Mr. Snyder's cases by minimizing them as involving a "small amount of drugs" when in fact the cocaine possession required the prosecution to charge Mr. Snyder with at[]least a class 4 Felony, but the district court sustained the prosecution's objection stating: "he can't possibly know that except by his lawyer saying . . ."

(Doc. # 2 at p.15 (citations to the record omitted).)

Petitioner argues that it was relevant and necessary to cross-examine Mr. Snyder regarding the seriousness of the charges he had been facing because that information "went directly to his motive to please the prosecution, bias, and credibility – factors that are never irrelevant, especially in regard to such a critical witness." (*Id.*)  In his traverse, Petitioner also argues that broad cross-examination was relevant and necessary because "discovery materials also raised the possibility that the p[r]osecution had made promises to Mr. Snyder regarding his cases."  (Doc. # 32 at p.10.)

The Confrontation Clause guarantees an accused the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  One of the primary interests secured by the Confrontation Clause is the right of cross-examination, *see Davis v. Alaska*, 415 U.S. 308, 315 (1974), because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," *id.* at 316.  However, a defendant does not have an unlimited right to cross-examination, and the trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  Thus, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).

> [A] criminal defendant states a violation of the Confrontation
> Clause by showing that he was prohibited from engaging in
> otherwise appropriate cross-examination designed to show a

> prototypical form of bias on the part of the witness, and
> thereby "to expose to the jury the facts from which jurors . . .
> could appropriately draw inferences relating to the reliability
> of the witness."

*Van Arsdall*, 475 U.S. at 680 (quoting *Davis*, 415 U.S. at 318).

The Colorado Court of Appeals applied this clearly established federal law and

concluded that Petitioner's cross-examination of Mr. Snyder properly was limited

because the specific facts of the prior offenses were not relevant.

> Here, defense counsel cross-examined the
> prosecution witness extensively about his grant of immunity
> and how that might affect his testimony. However, the trial
> court sustained the prosecutor's objection to further cross-
> examination regarding the nature of the charges that led to
> the witness's plea agreement, which had been entered into
> in a different jurisdiction and pursuant to which he was on
> probation at the time of his testimony. Defense counsel
> nevertheless subsequently elicited testimony from the
> witness that he had been out on probation, that he was
> currently in custody because a motion to revoke probation
> had been filed, and that the prosecution would decide
> whether his testimony would have any bearing on the
> decision to revoke probation.

> It was within the trial court's discretion to conclude
> that the facts of the transactions leading to the plea
> agreement were irrelevant and collateral to the issue of this
> witness's credibility.

> We do not agree with defendant that the court was
> precluded from reaching that conclusion because the
> prosecutor had "opened the door" to such testimony by
> referencing, and allegedly mischaracterizing, the nature of
> the underlying charges for which the witness was on
> probation. Even if the prosecutor's questions could be
> interpreted as opening the door to the cross-examination
> sought by defendant, the trial court nevertheless retained
> discretion to conclude that the topic was irrelevant.

(Doc. # 24-5 at pp.20-21 (citations omitted).)

The Court agrees that the facts of Mr. Snyder's prior offenses, specifically the amount of drugs he had possessed that led to the charges, were not relevant. The Court also agrees that, because the facts of Mr. Snyder's prior offenses were not relevant, limiting the cross-examination of Mr. Snyder with respect to those facts did not violate the Confrontation Clause. Petitioner cross-examined Mr. Snyder about his prior offenses. Petitioner also cross-examined Mr. Snyder regarding his grant of immunity and how that might affect his testimony. Finally, Petitioner cross-examined Mr. Snyder about the fact that a motion to revoke his probation had been filed and that the prosecution would determine whether his testimony would have any bearing on the decision to revoke probation. Therefore, the Court finds that Petitioner was not prevented from engaging in any relevant cross-examination of Mr. Snyder because it is clear that Petitioner was allowed to cross-examine Mr. Snyder regarding his alleged "motive to please the prosecution, bias, and credibility." (Doc. # 2 at p.15.) As a result, the Court concludes that this Confrontation Clause claim must be denied because the Colorado Court of Appeals' rejection of the claim is neither contrary to nor an unreasonable application of clearly established federal law.

**G. Claim Eight**

Petitioner contends in his eighth claim that the prosecution committed misconduct during closing arguments. Petitioner describes the factual basis for this claim as follows:

> The prosecution began its closing argument by

25

saying: "Ladies and gentlemen, despite the allegations of counsel, we know who killed Cath[e]rin[e] Dixon. And now you know who[]killed Cath[e]rin[e] Dixon." Later in its closing, the prosecution argued that the prosecution witnesses did not want to testify but that "[w]e made them come in here and testify, to tell the truth, to seek justice for Catherine Dixon. . . ." In its rebuttal closing argument, the prosecution repeated the same theme, stating of the prosecution witnesses: "What has been assured to you in this case is that they absolutely, positively must tell the truth. And the[y] did." Defense counsel objected to improper argument, but the district court overruled. Finally, in discussing the instructions regarding intoxication, the prosecution argued that the jurors could only consider intoxication if they "find that the petitioner was so intoxicated at the time of the shooting that he could not act deliber[a]t[e]ly." Defense counsel objected to the misstatement of law, but the district court overruled the objection. The prosecution then conti[n]ued to argue that the juro[r]s could only use intoxication if they found that Petitioner was "so intoxicated that he couldn't form the mental state." Defense counsel again objected that the prosecution was misstat[]ing the law and the district court again overruled the objection.

(Doc. # 2 at pp.17-18 (citations to the record omitted).) On the basis of these facts, Petitioner argues the following:

In fact, the prosecution blatantly violated the rule agains[t] implying knowledge of the facts by explicitly telling the jury "we know who killed Catherine Dixon. And[]you know who killed Catherine Dixon." . . . The prosecution then exacerbated its misconduct and additionally emphasized its role in investigating the case an[d] uncovering the "truth[,"] by stating that the prosecution "made [the witnesses] come in here[,"] demanded that they "tell you the truth[,"] and "they did." At the same time, the prosecution improperly appealed to the passions of the juro[r]s and injected the prosecution's personal opinion into the proceeding by asserting that the prosecution was "seek[ing] justice for Catherine Dixon." Those inflam[m]atory diversions from the evidence were highly improper. . . .

The prosecution also committed misconduct by

misstating the law to the jurors regarding intoxication. The prosecution incorrectly told the jurors that they . . . could consider intoxication only if they determined that Petitioner was so intoxicated that . . . "he could not act deliber[ate]ly" and "couldn't form the mental state." In fact, in determining whether Petitioner committed First Degree Murder and Attempted First Degree mur[]der, the jury was . . . require[d] to consider evidence of intoxication in determining whether the prosecution had proved beyond a reasonable doubt that Petitioner acted with the requisite mental state. The jurors were to consider not only whether Petitioner "<u>could not</u>" act deliber[ate]ly and intentionally because he was intoxicated, but whether, under the totality of the circumstances – including his intoxication – Petitioner <u>did</u> act after deliberation and with intent. The prosecution misled the jury on this crucial point.

(*Id.* at p.18 (citations to the record omitted).)

Habeas relief is available for prosecutorial misconduct only when the misconduct is so egregious that it renders the entire trial fundamentally unfair. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974). In order to determine whether prosecutorial misconduct rendered the trial fundamentally unfair, the Court must consider "the totality of the circumstances, evaluating the prosecutor's conduct in the context of the whole trial." *Jackson v. Shanks*, 143 F.3d 1313, 1322 (10th Cir. 1998).

The Colorado Court of Appeals applied this clearly established federal law and rejected Petitioner's claim of prosecutorial misconduct based on the following

reasoning:

We conclude that the comments of which defendant complains on appeal did not, singly or cumulatively, constitute prosecutorial misconduct warranting reversal. The prosecutor's statement that "we know" who killed the victim – to which no objection was made – did not suggest that her "knowledge" was based on anything other than the evidence

that had been brought out at trial. Nor did her comments regarding the prosecution witnesses having testified truthfully suggest that she "had formed an opinion of guilt based on evidence not presented at trial." *People v. Allee*, 77 P.3d 831, 836 (Colo. App. 2003). Thus, the comments could be viewed as permissible inferences drawn from testimony by prosecution witnesses that they had entered into immunity agreements which required them to give truthful testimony. In any event, to the extent they could be interpreted as improper expressions of the prosecutor's belief or improper invocations of the authority of her office, they were isolated comments that do not warrant reversal when viewed in the context of the argument as a whole and the evidence presented.

Further, even if the prosecutor's comment regarding the potential effect of intoxication on defendant's mental state could be considered misleading, it does not require reversal. The jury was properly instructed regarding the intoxication evidence and was also instructed that "closing arguments are not evidence."

Finally, the prosecutor's brief reference to seeking "justice" for the murder victim was not so inflammatory as to constitute plain error.

(Doc. # 24-5 at pp.24-25.)

The Colorado Court of Appeals' determination that Petitioner's constitutional rights were not violated as a result of prosecutorial misconduct is neither contrary to nor an unreasonable application of clearly established federal law. The Court agrees that the allegedly improper comments during closing arguments did not render Petitioner's trial, as a whole, fundamentally unfair. Although Petitioner contends that the prosecution's comments regarding knowledge of who killed Ms. Dixon and the veracity of the testimony of various witnesses were improper, it is also reasonable to construe those comments as permissible inferences drawn from the trial testimony as the Colorado Court of Appeals concluded. The Court also agrees that any misstatement of

28

the law regarding intoxication was cured when the jury properly was instructed regarding intoxication.  Finally, the prosecution's isolated reference to seeking justice for Ms. Dixon was not so inflammatory that it rendered the entire proceedings fundamentally unfair.  Therefore, this claim also lacks merit and will be denied.

## H.  Claim Nine

Petitioner finally claims that his enhanced sentence as an habitual criminal violates the Sixth Amendment right to trial by jury and due process because the facts necessary to support an enhanced sentence were found by the trial court rather than the jury.  Petitioner's ninth claim is premised on the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).

In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  In *Blakely*, the Supreme Court clarified "that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"  *Blakely*, 542 U.S. at 303.

The Colorado Court of Appeals rejected Petitioner's *Apprendi/Blakely* claim because Petitioner's sentence was enhanced as the result of his prior convictions.  That determination is neither contrary to nor an unreasonable application of federal law.  In fact, it is completely consistent with clearly established federal law, which explicitly excludes the fact of a prior conviction from the rule in *Apprendi*.  *See Apprendi*, 530

U.S. at 490.  Therefore, Petitioner's ninth claim also lacks merit and will be denied.

For the reasons discussed above, it is ORDERED that Petitioner Eric Humes'
Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Doc. # 2) is
**DENIED**.  It is FURTHER ORDERED that no certificate of appealability will issue
because Petitioner has not made a substantial showing of the denial of a constitutional
right.  The Clerk of the Court shall close this case.

Dated this 1st day of November, 2010

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge